**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| TRISTAN TOUZOT,<br><br>Plaintiff,<br><br>v.<br><br>ROM DEVELOPMENT CORPORATION AND JOHN AND JANE DOES NOS. 1 THROUGH 10,<br><br>Defendants.<br><br>—————————————<br><br>ROM DEVELOPMENT CORPORATION d/b/a CORE COMPOSITES,<br><br>Plaintiff,<br><br>v.<br><br>TRISTAN TOUZOT and TRANSFORMADERA, S.A.,<br><br>Defendants. | Civil Action No.: 15-6289 (JLL)<br><br>**OPINION** |

**LINARES**, District Judge.

This matter comes before the Court by way of an application for a preliminary injunction by ROM Development Corporation ("ROM" or "Core Composites") to enforce a non-competition agreement against its former employee Defendant Tristan Touzot ("Touzot") and to enjoin Defendants Touzot and Transformadera, S.A. ("Transformadera") from soliciting ROM's customers. Oral argument was heard in this matter on April 4, 2016. After considering the parties' submissions and the arguments at the April 4 hearing, ROM's application for a preliminary injunction is denied, and Touzot's cross-motion for dissolution of the Temporary Restraining

Order, entered on October 9, 2015 by the District of Rhode Island Court, is granted.

## I.      PROCEDURAL HISTORY

Touzot commenced this action on July 15, 2015 by filing a Complaint in the Superior Court of New Jersey, Chancery Division, Bergen County. *See* ECF No. 1.  On August 19, 2015, ROM removed the action to this Court pursuant to 28 U.S.C. § 1441.  *Id.*  On September 9, 2015, ROM filed a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2).  ECF No. 4-1.  On October 15, 2015, this Court denied ROM's motion to dismiss with respect to Plaintiff's contract claims, but granted ROM's motion to dismiss with respect to Plaintiff's tort claim (Count Three).  ECF Nos. 14, 15.

On October 1, 2015, during briefing on its motion to dismiss before this Court, ROM filed an action against Touzot and Transformadera in the District of Rhode Island for violation of the non-compete agreement, for misappropriating trade secrets, and for tortious interference, and sought a Temporary Restraining Order ("TRO") against them related to these alleged actions. Docket No. 15-8746, ECF No. 2.  The Rhode Island court granted ROM a TRO against Touzot. *See id.*, ECF No. 10 (Order, dated Oct. 9, 2015).   However, because the parties disputed which court should hear this matter, the Rhode Island court stayed the Rhode Island action and delayed a full hearing on the injunction application pending a decision on jurisdiction by this Court.  On Dec. 18, 2015, ROM's Rhode Island action was transferred to this Court and consolidated with Touzot's action. *See id.*, ECF No. 16.  At that point, ROM sought and was granted expedited discovery prior to a hearing on its preliminary injunction application before this Court, which was ultimately held on April 4, 2016.  ECF No. 34, 54.

## II.     BACKGROUND

Parties

ROM is a Rhode Island corporation with its principal place of business in Rhode Island. ECF No. 1 (Touzot Compl.), ¶ 7.  ROM has three employees and distributes various composite materials, including balsa wood for the model wood industry.  Hr'g Tr. (Apr. 4, 2016) at 7:11-23, 8:3-9:2 (Richard O'Meara[1]).  Model wood represented approximately 25% of ROM's sales and profit in the period 2011 to 2014.  *Id.* at 19:11-15.  Model wood is wood used in the construction of such things as model airplanes and boats, and it is typically required to be of a higher quality than some other balsa wood products.  *Id.* at 17:11-15, 200:12-16.  For this reason, sourcing such wood is challenging and, for ROM, whose model wood sales represent about 75% of the model wood industry, demand exceeds supply.  *Id.* at 25:4-19, 98:11-23.  ROM also sells epoxy resins and adhesives.  *Id.* at 7:23.

Touzot is an individual who is a resident of New Jersey.  ECF No. 1 (Touzot Compl.). Prior to working for ROM, Touzot had experience in the model wood industry, but he had no prior sales experience.  *See* Touzot Cert. (dated Feb. 17, 2016) ¶ 3; *see also* Hr'g Tr. at 177:6-8. However, when his prior employer, Baltek, Inc., announced that "it would be closing its New Jersey facility in 2011 and relocating to North Carolina," Touzot began exploring other employment options as he "had no intention of relocating [his] family out-of-state."  Touzot Cert. ¶ 6.

Transformadera is an Ecuadorian company formed in 2010 to manufacture wood, primarily balsa wood.  Cert. of Emmanuel Solari Bouriaud[2] in Opp'n to Mot. for Prelim. Inj. ("Bouriaud

---

[1] O'Meara is ROM's founder, owner, President and CEO.  Hr'g Tr. at 7:24-25, 8:1-2, 8-12.

[2] Mr. Bouriaud is "a principal/owner of Transformadera, S.A."  Bouriaud Cert. ¶ 1.

Cert.") ¶¶ 7, 9.  Transformadera supplies industrial and model grade balsa wood.  *Id.*  It does not distribute model balsa wood in the United States, and is not a direct competitor to ROM.  Hr'g Tr. at 145:6-8, 146:3-5.  Touzot knew Transformadera's founder, Mr. Bouriaud's father, from his prior employment with Baltek.  *See* Bouriaud Cert. ¶¶ 10-11.  Touzot developed Transformadera as a source for model wood for ROM, and Transformadera became a valued supplier of model wood to ROM over the course of Touzot's ROM employment.  *See id.* at 49:15-50:5.

ROM/Touzot Pre-Employment Negotiations

After initial discussions regarding employment with ROM between O'Meara and Touzot, on May 30, 2011, O'Meara send Touzot an "employment proposal." Hr'g Ex., Pl. 2.  The proposal specified that Touzot's job description included "[s]elling the full line of Core Composites materials with special emphasis to start on balsa core for the wind turbine and model wood market." *Id.*, Attachment at 1.  The proposal identifies some of ROM's model wood customers and prospective customers including Balsa USA, National Balsa, Trillium, and Midwest.  *Id.*  The proposal further states that ROM makes "an average margin of 25%" on model wood and that sales were $520,000 in 2008 but had fallen to less than $100,000 in 2011.  *Id.* at 4.  The proposal lists other employment terms including "a three year convenient [sic] not to compete in the accounts and for products that you have been representing for Core Composites or that Core Composites sells to that account should you decide to leave the company." *Id.* at 5.  Touzot did not agree to the proposal and a revised proposal was sent on June 6, 2011.  *See id.*, Pl. 3A & 3B.  Touzot also did not agree to this proposal.  The primary term being negotiated in these versions of the employment proposal were related to Touzot's car allowance.  *See* Hr'g Tr. at 32:21-33:3.

On June 28, 2011, O'Meara sent Touzot an "Employment Letter of Agreement." Hr'g Ex., Pl. 4 & 5.  This proposed agreement continued to indicate that Touzot would be "[s]elling the full

4

line of Core Composites materials with special emphasis to start on balsa core for the wind turbine and model wood market." *Id.*, Pl. 5, at 1.  It also stated that ROM would ask Touzot "to sign a three year convenient [sic] not to compete in the accounts and for products that you have been representing for Core Composites or that Core Composites sells to that account should you decide to leave the company." *Id.* at 5.  Touzot responded on June 30, 2011 stating:  "I reviewed the offer carefully and I am in agreement with all the different points.  Thank you again for this great opportunity with Core Composites and I look forward to joining the team beginning of August." *Id.*, Pl. 4.

Before Touzot joined ROM in August 2011 (Touzot Cert. ¶ 2), O'Meara was responsible for sourcing balsa model wood for ROM and for servicing ROM's model wood customers. *See* Hr'g Tr. at 19:16-21.  At the time of Touzot's hire, ROM had several sources for model wood, but the sources were not sufficient to meet the demand from ROM's customers. *Id.* at 24:24-25:19.  Additionally, ROM's model wood business had dropped, and O'Meara was looking for Touzot to help bring it back up. *Id.* at 25:11-15.  Transformadera was not one of ROM's suppliers at this time.

Non-Compete Agreement

Subsequent to commencing employment with ROM, ROM and Touzot executed an "Employee Non-Compete Agreement."[3]  Hr'g Ex., Pl. 6.  The Agreement was dated August 8, 2011, but not actually executed until approximately December 2011.  Hr'g Tr. at 37:13-24.

---

[3] Although ROM only seeks to enforce the non-solicitation portions of the agreement, *see infra* at 12, because of the agreement title, and for simplicity, the Court refers to the agreement herein as the "Non-Compete Agreement" or "Agreement."

The following paragraphs of the Agreement are relevant to the present dispute:

1. COVENANT NOT TO COMPETE

For good consideration and as an inducement for Company to employ Employee, if such employment is terminated for any cause, for a period of two (2) years after leaving the employment, Employment shall neither engage directly or indirectly, either personally or as an employee, associate partner, partner, manager, agent or otherwise, or by any means of any corporate or other device with exact or like products sold by Company, nor shall employee for such period an in such localities solicit orders, directly or indirectly, from any customers of Company or from any customers of its successor, for such products as are sold by Company or its successor, either for himself or as an employee of any person, firm or corporation.

2. DEFINITION OF TERMS

The term "not compete" as used herein shall mean that the Employee shall not own, manage, operate, consult or to be employed in a business substantially similar to, or competitive with, the present business of the Company or such other business activity in which the Company may substantially engage during the term of employment.

Competition means owning or working for a business of the following type: Agency sale or distribution of structural core materials, prepreg composites, carbon fiber or glass reinforcements used in the construction of composite parts to customers of ROM Development Corporation.

3. TRADE SECRETS

The Employee acknowledges that the company shall or may in reliance of this Agreement provide Employee access to trade secrets, customers, and other confidential data and good will.  Employee agrees to retain said information as confidential and not to use said information on his own behalf or disclose same to any third party.

The employee will take necessary actions to keep the company's business secrets, including but not limited to customer, supplier, logistical, financial, research and development information, confidential and not to disclose the company's business secrets to any third party during and after the term of the Employee's employment.

4. SPECIFIC ACCOUNT NON-COMPETITION CLAUSE

On the termination of the Employee's employment with the Company for any reason, the Employee will not solicit any customer of the Company that was a customer of the Company during the course of the Employee's employment with the Company, whether or not still a customer of the Company and whether or not

knowledge of the customer is considered confidential information or in any way aid and assist any other person to solicit any such customer for a period of two years from the date of termination of the Employee's employment.

Hr'g Ex., Pl. 6.   The Agreement further generally provides that it "shall extend only to the Americas and shall be in full force and effect for two years, commencing the date of employment termination." *Id.*[4]   The Non-Compete Agreement was drafted by O'Meara using the internet; he did not have an attorney review the document. Hr'g Tr. at 39:8-12.  Likewise, Touzot did not have an attorney review the Agreement prior to signing it. *See id.* at 211:21-212:2.

Before Touzot signed the Agreement, O'Meara admits that he "was teaching [Touzot] about what [ROM's] customer's model wood's specifications were," and admits that he was sharing ROM's confidential information with Touzot. *Id.* at 79:2-20, 94:10-95:1.

<u>Touzot Termination</u>

On March 27, 2015, ROM terminated Touzot.[5]  *See id.* at 55:2-4.  Despite the termination, O'Meara and Touzot engaged in discussions regarding a new contract or arrangement between ROM and Touzot wherein Touzot would start his own company and act as an agent "to source and sell model grade balsa to [Core Composites]."  Hr'g Ex., Def. 8; Hr'g Tr. at 55:18-56:3, 202:13-15.  O'Meara expressed his expectation that "Core Composites [would] handle all of the sales for model wood."  Hr'g Ex., Def. 8.  To this end, he stated:

In order for CC to agree to this arrangement we would want the current non-compete agreement to continue for model grade products for an additional five years for the model grade lumber business that we are doing together after the three

---

[4] Although some of the correspondence in this matter references the originally proposed three-year period for the Agreement, O'Meara admits that the executed Agreement is for a period of two years. *See* Hr'g Tr. at 61:9-15.

[5] The documents submitted indicate that Touzot was terminated as of a different date, but O'Meara testified (and Touzot does not appear to contest) that despite the emails, his official termination date was in March.  *See* Hr'g Tr. at 74:2-25; Hr'g Ex., Def. 8 (Email from O'Meara to Touzot, dated May 6, 2015) ("You are officially terminated as of May 6, 2015.").

year non-compete agreement ends in April 2018. . . . In regard to you and/or your start-up entity representing other supply companies into accounts that you had been representing Core Composite products in or other accounts that our company handles we would like to help you succeed if the products do not compete with our current offering.

*Id.* The discussions regarding any new arrangement between ROM and Touzot broke down over the "additional" non-compete request and threatened enforcement of the existing Agreement. Hr'g Tr. at 114:24-115:12, 217:16-25.

Not long after the discussions broke down, O'Meara believed that Touzot was violating the Non-Compete Agreeement. *See* Hr'g Ex., Def. 11 (Letter from ROM's counsel to Touzot, dated June 16, 2015). O'Meara referred the matter to his attorney who remind Touzot that he had "agreed that for a period of three years after leaving your employment with ROM you would not engage in competition with the company or solicit the company's customers." *Id.* On June 9, 2015, O'Meara informed Transformadera of his belief that Touzot was violating the Non-Compete Agreement with ROM. *See* Hr'g Ex., Pl. 7 (Email from O'Meara to Transformadera, June 9, 2015, subject "model wood purchases") ("Last night Tristan and I had a real falling out over this point as he feels that it is within his rights to sell to customers not currently buying from him such as Mid West Products. This is a direct violation of our current three year non-compete agreement that Tristan agreed to in writing when he started with Core Composites. I have been left no option but to defend our customer base.").[6]

At the time of Touzot's termination, ROM had 75% of sales in the model wood market, and Touzot was ROM's sales representative for all of its model wood customers. *See* Hr'g Tr. at 98:11-19, 116:8-117:16. Furthermore, at the time of his termination, Touzot acknowledged that

---

[6] Midwest was a ROM model wood customer during Touzot's employment with ROM, but was not a customer at the time of Touzot's termination. Hr'g Tr. at 130:18-23, 131:11-13.

ROM was not having any issues with their supplies of model wood; he agreed that "they were able to get it." *Id.* at 189:6-14.

Alleged Improper Behavior of Touzot and Transformadera Post Touzot's Termination

ROM alleges that after Touzot's termination, Touzot and Transformadera colluded to deprive ROM of its model wood supply, thereby allowing Touzot to target and steal ROM's model wood customers. *Id.* at 137:2-3.  ROM bases these allegations on the following facts.

In June 2015, shortly after discussions with Touzot broke down, Transformadera informed ROM that it would be raising the prices on model wood to ROM by 25 to 50%, and would require a 30% deposit before ROM could place orders 9with 70% due before the product left the factory). *Id.* at 59:2-60:8, 154:7-14.  Transformadera's stated reasons for the increase were due to expected weather issues and increased demand from China. *See* Bouriaud Cert. ¶¶ 38-39; Hr'g Ex., Pl. 7. However, O'Meara testified that the new prices quoted by Transformadera for model wood were suspiciously similar to the prices that ROM charged its model wood customers. *See* Hr'g Tr. at 59:2-9 ("The prices went up 25 to 50 percent depending on the product, and they very much reflected the sell prices to our customers. . . . [T]he price increases by item were so close to what we had been selling it to the customers for, that it looked very much like what we would be selling to them . . . ."), 167:22-168:2 ("That pricing that they sent back to us was almost a duplicate, even the way it was organized of the [Excel] spreadsheets that Tristan was using to put orders together and to speak, so it was -- what they answered in that and where the price increases came from were the specific products we were asking for in the purchase orders.").  From this, O'Meara surmises that Touzot shared ROM's pricing with Transformadera, and that both Touzot and Transformadera knew that ROM would be unable to agree to this price because it would eat up all of ROM's profits. *See id.* at 59:7-11, 167:3-8.  O'Meara further found the price increases by Transformadera

suspicious "[b]ecause the price of balsa hasn't moved up like that from any supplier at any time in history nor this year at those rates." *Id.* at 160:9-16; *see also id.* 63:10-19 (O'Meara testifying that prices have never been raised that much "in the 40 years [he has] been doing this."). Additionally, none of ROM's other model wood suppliers had raised their prices; the prices actually got better over the period at issue. *See id.* at 162:22-163:2. Because ROM no longer could buy model wood from Transformadera, it was unable to meet the demand of customers. *See id.* at 133:7-8, 164:2-22. O'Meara testified that, prior to Touzot's termination, there was not an issue with the prices or supply of model wood. *Id.* at 148:22-24. Touzot agreed that "in the period 2011 to 2015, when [he was] assisting with supplying model wood for ROM, [he never saw] a price increase from Transformadera in the range of 25 to 50 percent." *Id.* at 192:7-11.

After ROM's supply of model wood was diminished, ROM then alleges that Touzot and/or Transformadera began contacting or otherwise talking to ROM's model wood customers to supply model wood. *See, e.g., id.* at 129:3-10. In fact, the sales report from Touzot's new company (TComposites LLC) indicates that, post his termination from ROM, he has sold model wood to Guillow, Balsa USA, National Balsa, and Midwest Products. *See* Hr'g Ex., Pl. 8; *see also* Hr'g Tr. at 179:1-187:13. Touzot admits that these were all "customers [he] dealt with during [his] term at ROM." Hr'g Tr. at 179:1-7. He further admits that he met the contacts for these customers "in the course of [his] employment with ROM," and they he did not know them before he worked at ROM. *Id.* at 179:1-184:12. He further admits that all of the model wood that he sold to these customers was supplied to TComposites by Transformadera, and that the prices that he paid for the model wood from Transformadera was about the same as what Transformadera previously charged to ROM (without any 25-50% increase as quoted to ROM). *See id.* at 187:3-14; *see also* 172:20-173:16; Hr'g Ex., Pl. 9 (Transformadera invoices showing prices charged to TComposites).

In fact, Transformadera is (and has been) Touzot's only supplier of model wood, and 50-60% of his current customer base are customers he served at ROM. *See* Hr'g Tr. at 187:4-8, 201:7-13, 208:22-209:9, 210:23-211:20.

The ROM model wood customers who are currently purchasing from Touzot have allegedly expressed to O'Meara a continued willingness to do business with ROM, but ROM is unable to fill their orders because of insufficient access to a supply of model wood. *See id.* at 133:3-8, 134:6-9, 164:2-22, 201:4-6. ROM is able to obtain some model wood from Baltek and Blasasud, but the quantities are insufficient to meet demand. *See id.* at 27:14-6, 163:22-164:22.

Touzot admitted that "[n]othing about the TRO prevents [him] from selling that to customers that are not customers of ROM," and that "[t]here are many other customers [he] could go and market" to, but that most were outside the Northeast region. *Id.* at 219:9-16. He further acknowledged that he "could work in a lab in the industry like [he previously] did at Baltek," and that "[t]here are other jobs [he] could have in the industry, other than selling model wood or epoxy." *Id.* at 220:8-18. He also admitted that he discussed the Non-Compete Agreement with Transformadera, and that he told them that it did not cover model wood. *See id.* at 192:14-21; *see also* Bouriaud Cert. ¶¶ 29-30. However, he denies that he and Transformadera are partners. *See* Hr'g Tr. at 212:14-18.

O'Meara admitted that ROM has no exclusivity with Transformadera and that Transformadera could "do business with whoever they like." *Id.* at 144:18-145:1. He further acknowledged that Transformadera was not barred from selling directly to ROM's customers, and that they had the right to raise prices to ROM. *See id.* at 57:8-13, 148:1-8, 161:10-16. O'Meara, however, disagrees that Transformadera and Touzot may collude to interfere with ROM's customers in violation of Touzot's obligations under the Agreement.

<u>Remedy Sought by ROM</u>

ROM is not seeking enforcement of all provisions of the Non-Compete Agreement. It seeks only to enforce the non-solicitation, not the non-compete, provisions. *See id.* at 119:5-120:10. As ROM's counsel made clear at the April 4 hearing, "ROM seeks a preliminary injunction that would preclude Mr. Touzot from doing business with ROM customers for products that ROM sells, ROM's customers . . . defined as the customers that ROM was selling during the course of Mr. Touzot's employment and before as well that were known to and being developed by ROM." *Id.* at 119:7-14.[7] ROM concedes that "new customers are fair game," that "products that you [ROM] don't sell are fair game," and that, if Touzot "has taken business at an account that was not [ROMs]," that is not objectionable. *Id.* at 40:18-20, 120:3-10, 130:7-8.

## III.   LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [(1)] that he is likely to succeed on the merits, [(2)] that he is likely to suffer irreparable harm in the absence of preliminary relief, [(3)] that the balance of equities tips in his favor, and [(4)] that an injunction is in the public interest." *HR Staffing Consultants LLC v. Butts*, No. 15-2357, 2015 WL 5719655, at *2 (3d. Cir. Sept. 30, 2015) (alteration in original) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (same).

---

[7] ROM accepted Touzot's representation that any confidential documents that he possessed and was ordered to return have been returned to ROM. Hr'g Tr. at 96:16-97:12.

## IV.   PRELIMINARY INJUNCTION ANALYSIS

### A.   Likelihood of Success on the Merits – Contract Claims

#### 1.   Enforceability of the Non-Compete Agreement

ROM argues that it is likely to succeed on its claim that Touzot breached the Non-Compete Agreement. *See* ROM's Mot. at 18.  "To state a claim for breach of contract, [a party] must allege (1) a contract between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations." *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).[8]

Here, the dispute is not over whether the non-solicitation provision is enforceable at all. Instead, the parties dispute the scope of the limitation.  ROM asserts that the agreement prohibits Touzot from "doing business with ROM customers for products that ROM sells."  Hr'g Tr. at 119:7-14.  Touzot argues that sales of model wood to ROM's customers is not covered by the Agreement as it is not listed in the definition of "Competition" in Section 2.  *See* Touzot Opp'n at 6.[9]  The Court therefore first must address the parties' contract interpretation arguments, and then address whether any restriction is reasonable.

---

[8] "[I]n a diversity action, a district court must apply the choice of law rules of the forum state to determine what law will govern the substantive issues of a case." Warriner v. Stanton, 475 F.3d 497, 499–500 (3d Cir.2007) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). "If there is no distinction between the potentially applicable laws, there is no choice-of-law issue to be resolved and the court will apply the law of the forum state." Clark v. Prudential Ins. Co. of America, No. 08-6197, 2009 WL 2959801, *5 (Sept. 15, 2009). Here, the parties agree that there is no substantial difference with respect to the contract claim between Rhode Island and New Jersey law.  *See* Hr'g Tr. at 245:17-25.  Therefore, for purposes of this motion, the Court has applied New Jersey law (that argued by Touzot).

[9] Touzot also argues that the agreement may only be enforced if he was terminated for cause. *See* Hr'g Tr. at 207:25-208:20. For this argument, Touzot ignores the plain language of the agreement, and instead relies on the Employment Agreement email. *See id.*; Hr'g Ex., Pl. 5.  However, the Non-Compete Agreement plainly states that the provisions apply if Touzot is terminated "for any cause" (Hr'g Ex. 6, § 1) or "for any reason" (*id.* § 4).  This language is plain and unambiguous,

In interpreting a contract, a court should "read the document as a whole in a fair and common sense manner." *Hardy ex rel. Dowdell v. Abdul-Matin*, 965 A.2d 1165, 1169 (N.J. 2009). Additionally, "[i]nterpretation of a contract is ordinarily a question of law for the courts[, but] when the contract is ambiguous, extrinsic evidence may be required to discern its meaning, transforming the question into one of fact to be resolved by the fact finder, except where the evidence and resulting inferences are uncontroverted." *Fox v. U.S. Dept. of Housing and Urban Development*, 680 F.2d 315, 319-20 (3d Cir. 1982) (citing *Barco Urban Renewal Corp. v. Housing Authority*, 674 F.2d 1001, 1007-08 (3d Cir., 1982)).   The Court may not consider extrinsic evidence, however, where the terms of a written agreement are neither ambiguous nor uncertain. *See, e.g., Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 195 N.J. 231, 238, 948 A.2d 1285 (2008) ("If the term's of the contract are susceptible to at least two reasonable alternative interpretations, an ambiguity exists. In that case, a court may look to extrinsic evidence as an aid to interpretation.").   Further, in ascertaining the meaning of a contract's terms, "[t]he relevant search . . . is not for the subjective intention of the parties but what (their) words would mean in the mouth of a normal speaker of English, using them in the circumstances in which they were used." *Fox*, 680 F.2d at 320 (internal quotations omitted).   And, a court "may not make a different or better contract than the parties themselves saw fit to enter into." *Pennbarr Corp. v. Ins. Co. of N. Am.*, 976 F.2d 145, 151 (3d Cir. 1992).

The language of the Non-Compete that ROM relies on is found in Sections 1 ("Covenant Not to Compete") and 4 ("Specific Account Non-Competition Clause").   The non-solicitation portion of Section 1 provides:

---

and cannot be interpreted as argued by Touzot to mean "for cause". The letter also states that the term of the non-compete would be three years.   Certain items clearly changed between the employment agreement email and the subsequent execution of the Agreement.

> [N]or shall employee for such period an in such localities solicit orders, directly or indirectly, *from any customers of Company* or from any customers of its successor, *for such products as are sold by Company* or its successor, either for himself or as an employee of any person, firm or corporation.

Hr'g Ex., Pl. 6 (emphasis added).  Section 4 provides:

> On the termination of the Employee's employment with the Company for any reason, the Employee will not solicit *any customer of the Company that was a customer of the Company during the course of the Employee's employment with the Company, whether or not still a customer of the Company and whether or not knowledge of the customer is considered confidential information* or in any way aid and assist any other person to solicit any such customer for a period of two years from the date of termination of the Employee's employment.

*Id.* (emphasis added).  Both of these provisions plainly apply to "any customers" and for "such products as are sold by the Company."  Neither provision indicates that this broad language is limited to the products identified in one of the definitions in Section 2 nor do they contain any other limiting language.  Nevertheless, Touzot argues that the definition of Competition in Section 2 applies to limit this otherwise broad language.  Competition in Section 2 is defined as:

> owning or working for a business of the following type: Agency sale or distribution of structural core materials, prepreg composites, carbon fiber or glass reinforcements used in the construction of composite parts to customers of ROM Development Corporation.[10]

*Id.*

The Court is unpersuaded by Touzot's argument.  First, there are two definitions in Section 2, and the definitions themselves are inconsistent if "Competition" is read in the more limited way suggested by Touzot.  Pursuant to Section 2,

> The term "not compete" as used herein shall mean that the Employee shall not own, manage, operate, consult or to be employed *in a business substantially similar to, or competitive with, the present business of the Company* or such other business activity in which the Company may substantially engage during the term of employment.

---

[10] The parties dispute whether this language includes or does not include model wood.  *See, e.g.,* Touzot Opp'n at 6.  Because the Court resolves this issue for purposes of the injunction application even assuming Touzot's more limiting definition, it does not need to resolve that issue at this time.

*Id.* (emphasis added).    Second, neither term defined in Section 2—"not compete" or "competition"—are actually used in the non-solicitation provisions.  The Section 1 language cited above is contained under a *heading* that contains the phrase "not to compete" which would most closely be associated with the broader "not compete" definition, which bars any substantially similar business (even if the Court were to apply such definition because of a heading where the term is not used in the actual language of the provision).  The Section 4 language cited above is contained under a *heading* that contains the phrase "non-competition," which could reasonably be read as similar to "not compete" or the negative of "competition"—it is not a clear reference to either defined term.  And again, the actual language of Section 4 does not refer to either term and contains no limiting language.  On the other hand, this was a contract drafted by O'Meara without attorney input, and reading it most favorably to Touzot, there is a question as to why the definition of competition was included at all; the parties give conflicting reasons.  *See* Hr'g Tr. at 113:21-115:5 (O'Meara), 201:21-202:5 (Touzot).  For this reason, the Court finds the language regarding the scope of the non-solicitation provision ambiguous, and has therefore considered other extrinsic evidence.[11]

Touzot testified that during the negotiations of the Non-Compete Agreement he "told Mr. O'Meara that [he] wanted to have some restrictions in the noncompete, in the event that, you know, something would happen."  *Id.* at 201:21-202:5.  He testified that he "told him [O'Meara] that due

---

[11] To the extent that ROM argues that the non-solicitation covers customers prior to Touzot's employment, *see* Hr'g Tr. at 41:11-14, the Court disagrees.  O'Meara acknowledged that the language of the contract was not this broad.  *See id.* at 41:15-42:5.  Likewise to the extent that Touzot argues that customers only covers those customers that were customers at the time of his termination, the Court also disagrees.  Section 4 plainly applies to "any customer of the Company that was a customer of the Company *during the course of the Employee's employment with the Company, whether or not still a customer of the Company*."  Hr'g Ex., Pl. 6 (emphasis added).

to my experience in model wood, I would prefer that model wood stays out of the agreement." *Id.* O'Meara, on the other hand, testified that, before the Agreement was executed, Touzot "did not specify any particular objection to any of the products." *Id.* at 38:16-20, 40:12-14. Additionally, O'Meara testified that when he and Touzot had the discussions regarding a new arrangement as an agent, Touzot told O'Meara that "he would honor the noncompete, that he recognized it, and he did not want to compete with us." *Id.* at 56:4-20; *see also id.* at 114:24-115:12. When O'Meara was asked whether he would "have agreed to exclude model wood from this noncompete agreement, if Mr. Touzot had asked," he testified:

> No way. It was an important part of our business in the past. It was at that time still a good portion of our company, and it was something that's, you know, dear to my heart, and there is no way I would have carved it out.

*Id.* at 41:2-7. The Court finds O'Meara's testimony likely to be found to be more credible and supported by the documents. The Employment Agreement proposal stated that the non-compete was to cover "the accounts and . . . products that you have been representing for Core Composites or that Core Composites sells to that account," without limitation. Hr'g Ex., Pl. 5. The proposed employment agreement was clear that Touzot's employment would have a "special emphasis to start on balsa core for the wind turbine and model wood market." *Id.* Touzot responded to this offer by writing: "I reviewed the offer carefully and I am in agreement with all the different points." *Id.* His response, after careful review, contains no concern over the reference to all products in the non-compete section nor does it indicate an understanding that such a limitation was part of the agreement.

It is possible that, in the time between agreeing to the employment terms and execution of the Non-Compete Agreement, there were negotiations and some adjustments (for example, the three year period became two), but there is no evidence before the Court that such a change of

negotiations with respect to the scope of the non-solicitation occurred or that Touzot had always expressed concern over such a limitation as he testified.  In fact, O'Meara's May 6, 2015 email regarding the potential new post-termination agency arrangement stated that he was seeking to *continue* "the current non-compete agreement . . . for model grade products" for an *additional* period of years.  Hr'g Ex., Def. 8.  Based on the evidence before the Court at this time, including the testimony at the April 4 hearing, it appears that this email occurred prior to O'Meara's consultation with an attorney as discussions with Touzot had not broken down at that time.  O'Meara also credibly testified that he would never have agreed to such a limitation when he was turning over a portion of his role to a new person, and introducing Touzot to all of his customers for business that represented 25% of ROM's sales and profits.  Touzot's position simply is not supported by any evidence other than his testimony, and it is contradictory to his email expressing "agreement with all the different points" of ROM's proposed employment agreement.

For all of these reasons, the Court finds that ROM is likely to succeed in proving that the Agreement limited Touzot from "solicit[ing] orders, directly or indirectly, from any customers of Company or from any customers of its successor, for such products as are sold by Company or its successor, either for himself or as an employee of any person, firm or corporation" for "any customer of the Company that was a customer of the Company during the course of the Employee's employment with the Company, whether or not still a customer of the Company and whether or not knowledge of the customer is considered confidential information or in any way aid and assist any other person to solicit any such customer for a period of two years from the date of termination of the Employee's employment."[12]

---

[12] At the hearing, Touzot expressed his position that his sales to ROM's customers after the Rhode Island Court entered the TRO did not violate that Order as the customers allegedly called him, and as such he did not "solicit" them.  *See* Hr'g Tr. at 185:3-24 ("The TRO is very clear that I cannot

18

Having found ROM's contract interpretation argument likely to succeed, the Court now turns to whether such a restriction is likely to be enforceable. "Under New Jersey law, a non-compete will be enforced 'where it [(1)] simply protects the legitimate interests of the employer, [(2)] imposes no undue hardship on the employee, and [(3)] is not injurious to the public.'" *HR Staffing*, 2015 WL 5719655, at *2 (quoting *Solari Indus., Inc., v. Malady*, 264 A.2d 53, 56 (N.J. 1970)); *see also Cmty. Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005) (applying what is "now known as the *Solari/Whitmyer* test[,] for determining whether a noncompete agreement is unreasonable and therefore unenforceable") (alteration in original). A restrictive agreement will not be enforced "merely to aid the employer in extinguishing competition, albeit competition from a former employee." *Ingersoll–Rand Co. v. Ciavatta*, 542 A.2d 879, 892 (N.J. 1988).

In considering the first prong of the test, employers have a legitimate interest in preventing the disclosure of confidential information as well as protecting customer relationships. *See HR Staffing*, 2015 WL 5719655, at *3; *Cmty. Hosp.*, 869 A.2d at 897 (legitimate interests include "protecting confidential business information" and customer lists); *Ingersoll–Rand*, 542 A.2d at 893-94 (employers have a legitimate interest "in protecting trade secrets, confidential information, and customer relations"); *Whitmyer Bros., Inc. v. Doyle*, 274 A.2d 577, 581 (N.J. 1971) (employers have "a patently legitimate interest in protecting his trade secrets as well as . . . confidential

---

solicit any orders from the customers, meaning that I cannot ask them for orders. I did not."). He admits that he sold them products and filled their orders. *Id.* The Court disagrees with Touzot's understanding of the meaning of solicitation (either directly or indirectly as covered by the Agreement). *See, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano*, 85 F.Supp.2d 491, 496 (E.D.Pa. 2000). Here, the testimony indicates that, after he was terminated, he interacted with ROM's customers enough to apprise them that he now had his own business supplying model wood and that he would be happy to fill their orders, and there is testimony indicating that Transformadera contacted a ROM customer related to model wood sells through Touzot. *See, e.g.,* Hr'g Tr. at 129:3-10, 179:12-21 (testifying that he visited a ROM customer, Guillow, "to discuss [his] . . . ability to supply Guillow with model wood.").

business information and . . . an equally legitimate interest in protecting . . . customer relationships"). Here, ROM has a legitimate interest in its customer relationships, which admittedly are being impacted by Touzot's actions.

Aside from analyzing whether a protectable interest is at stake, "three additional factors should be considered in determining whether the restrictive covenant is overbroad: its duration, the geographic limits, and the scope of activities prohibited. Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests." *Cmty. Hosp.*, 869 A.2d at 897. New Jersey courts recognize that restrictive covenants "clearly limit an employee's employment opportunities and in many instances probably interfere with an employee securing a position in which he could most effectively use his skills, at the same time depriving society of a more productive worker." *Ingersoll–Rand*, 542 A.2d at 894. "Accordingly, courts must evaluate the reasonableness of [a restrictive covenant] in light of the individual circumstances of the employer and employee" and "balance the employer's need for protection and the hardship on the employee that may result." *Id.*

Here, the duration of the restrictions—two years—has not been contested, and such durations have been found to be reasonable under New Jersey law. *See, e.g., Cmty. Hosp.*, 869 A.2d at 897-98 (two years reasonable); *Trico Equip., Inc. v. Manor*, No. 08-5561, 2009 WL 1687391, at *7 (D.N.J. June 13, 2009) (two years reasonable). With respect to geographic parameters, a specific territory limitation is not always necessary for the enforcement of a non-solicitation clause. *See Trico Equip.*, 2009 WL 1687391, at *7 ("While New Jersey courts seem to require geographic limits for non-compete clauses, geographic limitations do not appear necessary for non-solicitation provisions."); *Pathfinder L.L.C. v. Luck*, No. 04-1475, 2005 WL 1206848, at *7 (D.N.J. May 20, 2005) ("[B]ecause the restrictive covenant was limited to clients,

for a limited duration, it is not unreasonable merely because the geographical limits were open-ended."); *Platinum Mgmt., Inc. v. Dahms*, 666 A.2d 1028, 1040 (N.J. Super. Ct. Law Div. 1995) ("[T]he failure to restrict the geographical area is not significant, since the provision essentially sought to protect existing customer relationships rather than a territorial sphere of influence."). Here, Touzot accepted a position without territorial restriction (the Agreement is limited to the Americas), ROM's customers are an identifiable group, and Touzot has admitted that other employment opportunities are available to him. *See* Hr'g Tr. at 219:9-16, 220:8-18. Thus, the Court finds that the restriction to ROM's customers in the Americas is not overly broad under the facts of this case.

Finally, "the restrictive covenant [must] impose no undue hardship on the employee." *Cmty. Hosp.*, 869 A.2d at 898. The New Jersey Supreme Court has stated:

> In applying this part of the test, the reason for the termination of the parties' relationship is also relevant. If the employee terminates the relationship, the court is less likely to find undue hardship as the employee put himself or herself in the position of bringing the restriction into play. On the other hand, where the employer causes the parties to separate, "enforcement of the covenant may cause hardship on the employee which may fairly be characterized as 'undue' in that the employee has not, by his conduct, contributed to it."

*Id.* It is undisputed that Touzot was terminated, but it is likewise undisputed that Touzot could obtain other employment outside the bounds of the restrictions, but that he would rather not. *See* Hr'g Tr. at 219:9-16, 220:8-18. Touzot agreed to employment without restrictions on territory, on the understanding that he would need to travel in order to fulfill his job responsibilities. *See* Hr'g Ex., Pl. 5 at 4. Arguments that he now would prefer something different are unpersuasive in arguing that the restriction will cause an unacceptable hardship. Touzot appears to find soliciting ROM's customers who he was introduced to by O'Meara, and who he did not know prior to working at ROM, easier than developing other employment, which he admits is available to him.

For these reasons, the Court finds that ROM is likely to succeed in proving that a restriction against Touzot from soliciting or assisting with the solicitation of ROM's customers will be enforceable. The Court further finds that, given that Touzot admits that he has and is selling to ROM's customers, ROM will likely succeed in proving that Touzot breached the Non-Compete Agreement, and that ROM has suffered damages due to the breach. The Court stresses that this finding is in the context of ROM's application for a preliminary injunction. It is not a final ruling on the interpretation of the Agreement or on whether Touzot breached the agreement. It is the Court's analysis based on the undisputed facts before it and the information put forward by the parties.

**B.    Likelihood of Success on the Merits – Misappropriation Claims Against Touzot and Transformadera**

ROM argues that Touzot and Transformadera have violated Rhode Island Uniform Trade Secrets Act (RIUTSA).[13]   ROM's Mot. at 11 (citing R.I. Gen. Laws § 6–41–1(4)).  The RUITSA "defines a trade secret . . . as information that is 'not . . . readily ascertainable by proper means by[ ] other persons who can obtain economic value from its disclosure or use.'" *APG, Inc. v. MCI Telecomm'ns Corp.*, 436 F.3d 294, 303 (1st Cir. 2006) (citing § 6–41–1(4)(i)).  It "does not require that the misappropriator use or disclose the trade secret or incorporate it into a product. Rather, acquisition of a trade secret, with knowledge that it was acquired by improper means, is sufficient." *Alifax Holding SpA v. Alcor Scientific, Inc.*, 2015 WL 5714727, at *3 (D.R.I. Sept. 29, 2015) at *6 (citing R.I. Gen. Laws § 6–41–1(2)(i)).

---

[13] ROM and Transformadera disagree on whether Rhode Island or New Jersey law applies to these claims.  Because the Court finds ROM unlikely to succeed on these claims even assuming their chosen law, the Court need not resolve this issue at this time.

ROM argues that "the specific information of our valued customers that each one of them had by the different grade and a different price" and information of the quality of wood they required was a trade secret. *See, e.g.*, Hr'g Tr. at 98:1-4, 106:20-107:3, 141:8-10. However, O'Meara admitted that a competitor who wanted to solicit one of ROM's clients could simply ask what grade they prefer, and could ask the prices they are currently being charged. *See id.* at 52:23-25, 108:4-15. O'Meara further testified that, although, in his experience, customers were reluctant to give out pricing information, it did not mean that they would not give out such information. *Id.* at 143:12- 144:3. He also admitted that Transformadera knew the identity of at least some of ROM's customers, and that ROM shared customer quality and pricing information with Transformadera. *See id.* at 169:13-22 ("We were teaching them everything we could about it . . . ."), 170:6-14. He further acknowledged that ROM has no non-compete or non-solicitation with Transformadera, that ROM was simply "trust[ing] them." *Id.* at 170:15-25.

Even assuming that Transformadera did not previously have ROM's customer pricing and quality information (which it appears to have had at least with respect to some customers), the Court agrees with Touzot and ROM that the information that ROM asserts is a trade secret is information that was "obtainable within normal business channels had [Transformadera] sought to do so." *APG*, 436 F.3d at 307. Thus, as the *APG* Court found, "the information at issue here does not constitute trade secrets. It may well have been knowledge that [Transformadera] originally obtained unfairly and then used to its advantage without properly compensating [ROM]," but that may not form the basis of a misappropriation of trade secret claim. *Id.* Thus, the Court finds that ROM is not likely to succeed on its misappropriation claims against Touzot or Transformadera.

**C.     Likelihood of Success on the Merits – Tortious Interference Claims.**

"The elements of a claim for tortious interference with contractual relations under Rhode Island law are: (1) the existence of a contract; (2) defendants' knowledge of the contract; (3) defendants' intentional interference with the contract; (4) damages caused by the interference."[14] *APG, Inc.*, 436 F.3d at 303 (citing *Western Mass. Blasting Corp. v. Metro. and Cas. Co.*, 783 A.2d 398, 401 (R.I.2001); *Jolicoeur Furn. Co. v. Baldelli*, 653 A.2d 740, 752 (1995)). "The same elements are required to state a claim based on tortious interference with a prospective contractual relationship, with the exception that the defendant's knowledge must relate to a business relationship or expectancy, rather than to an actual contract." *Id.* (citing *Mesolella v. City of Providence*, 508 A.2d 661, 669–70 (R.I.1986)).

While the Court finds that ROM may be able to state tortious interference claims against Touzot and Transformadera, the evidence is insufficient at this time to find that ROM is *likely* to succeed on the merits of these claims as the evidence points to two reasonably plausible explanations for Transformadera's and Touzot's actions in working together since Touzot's termination from ROM.[15] Transformadera's version is that Transformadera was unaware that Touzot's Agreement limited him from selling model wood to ROM's customers, that it was not bound to do business with ROM, that it could raise its prices to whatever it wanted, that it was simply selling model wood through the channels available to it under arrangements that worked for it, and that it was willing but not required to continue to do business with ROM.  ROM's version is that there were no problems with model wood supply or prices with Transformadera

---

[14] ROM and Transformadera also disagree on whether Rhode Island or New Jersey law applies to these claims.  The Court also does not need to resolve this issue at this time given its ruling.

[15] As the parties have not raised the issue for purposes of this motion, the Court has not evaluated whether ROM may bring both a contract and tort claims against Touzot based on the same facts.

prior to Touzot's termination, that after his termination, Touzot and Transformadera worked together to pick price points (using Touzot's knowledge of ROM's customers) at which Transformadera could raise its model wood prices which would preclude ROM from buying from them effectively leaving ROM without a known needed supply, so that its customers could then be directed to Touzot to purchase model wood supplied to Touzot at ROM's old prices despite Touzot's Agreement with ROM.

### D.    Irreparable Harm

Even though the Court has found that ROM is likely to succeed on the merits of its contract claim against Touzot, an injunction is not appropriate unless ROM also can show that it will suffer "immediate irreparable injury." *Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 205 (3d Cir. 1990) (internal quotations omitted).  In other words, ROM must demonstrate that its loss is not compensable in money, which is "not an easy burden." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000).  Threatened disclosure of trade secrets may be sufficient to support a finding of irreparable harm warranting an injunction.  *See, e.g., HR Staffing*, 2015 WL 5719655, at *4 (citing *Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*, 530 A.2d 31, 33 (N.J. App. Div. 1987)).  However, for the reasons discussed above (*see supra* at 22-23) ROM has not met its burden of establishing that the information O'Meara fears may be disclosed is information that is not otherwise available through normal business channels.   Thus, the harm here (based on the evidence submitted by the parties in their briefs and through testimony at the April 4 hearing) is lost sales, which supports that damages, if any, can be sufficiently compensated for through a monetary award.  For these reasons, the Court concludes that ROM has not established a likelihood of irreparable harm absent an injunction.  Because of this finding, the Court need not address the other injunction prongs.

## V.      CONCLUSION

For the reasons set forth above, ROM's motion for a preliminary injunction is denied, and Touzot's motion to dissolve the TRO is granted.  An appropriate Order accompanies this Opinion.

DATED:  April 26, 2016

JOSE L. LINARES
U.S. DISTRICT JUDGE